# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ANGELA A. WEAR, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> COMMISSIONER OF ) <br> SOCIAL SECURITY, ) <br> ) <br> Defendant. ) | Civil Action No. 11-901 <br><br> Judge Mark R. Hornak <br> Magistrate Judge Lisa Pupo Lenihan |

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

### I. RECOMMENDATION

It is respectfully recommended that the Court deny Plaintiff's Motion for Summary Judgment, grant Defendant's Motion for Summary Judgment, and affirm the decision of the administrative law judge ("ALJ").

### II. REPORT

**A. BACKGROUND**

**1. General**

Angela A. Wear ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g), seeking review of the final determination of the Commissioner of Social Security ("Defendant" or "Commissioner") denying her application for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401 – 433 ("Act"). Plaintiff filed for DIB on February 18, 2009, claiming an inability to work as of October 15, 2007 due to disability resulting

primarily from fibromyalgia, arthritis, headaches, and physical weakness. (R. at 127 – 30, 146 – 54, 190 – 200)[1]. This matter comes before the court on cross motions for summary judgment. (ECF Nos. 12, 14).

Plaintiff was born on December 10, 1963, and was forty six years of age at the time of her administrative hearing before the ALJ. (R. at 34). Plaintiff lived with her disabled husband and sixteen year old daughter. (R. at 34 – 35). Plaintiff completed high school and business college. (R. at 37). She maintained a driver's license. (R. at 37). She was last gainfully employed on or about July 14, 2007 as a housekeeper. (R. at 43, 128, 252, 282).

Plaintiff suffered limitations stemming from a number of diagnosed conditions that the ALJ identified as "severe impairments," including fibromyalgia, degenerative disc disease, shoulder rotator cuff tendonitis, diffuse myalgia, and carpal tunnel syndrome status post release. (R. at 20). The ALJ derived the following residual functional capacity assessment to accommodate limitations experienced as a result of said impairments:

> After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform sedentary work as defined in 20 C.F.R. 404.1567(a) except she would need a sit/stand option as often as every 30 minutes; she could do no more than occasional balancing, stooping, kneeling, crouching, crawling and climbing; she could do no more than occasional overhead reaching; she would need to be in a climate controlled environment; and she must avoid temperature extremes or humidity.

(R. at 21). Plaintiff does not take issue with these findings by the ALJ. Instead, Plaintiff argues that headaches should have been included in her list of "severe impairments," and that the failure to do so resulted in a flawed residual functional capacity assessment by the ALJ. She asserts that the ALJ was plainly incorrect in failing to consider her headaches to be "severe," based upon the record evidence and her testimony.

---

[1] Citations to ECF Nos. 7 – 7-11, the Record, *hereinafter*, "R. at __."

**2. Medical Record**

The record shows that Plaintiff first complained of headache pain to her primary care physician James Liszewski, M.D. on March 29, 2007. (R. at 288). The pain began approximately three days prior to her visit to Dr. Liszewski. (R. at 288). Plaintiff was provided with prescription medication for treatment. (R. at 288). On April 25, 2007, Plaintiff visited Dr. Liszewski for a follow-up regarding previously diagnosed headache pain. (R. at 285). Plaintiff was considered to suffer the ill-effects of frequent tension migraine headaches and was provided with prescription Pamelor and Naproxen, which provided relief. (R. at 285). Plaintiff's headache pain, when present, was thereafter characterized as low-grade – 3 on a pain scale of 10. (R. at 286).

On June 14, 2007, diagnostic imaging of Plaintiff's cervical spine – from which much of Plaintiff's claimed headache pain allegedly originated – revealed that Plaintiff's vertebral alignment was normal, there were no osseous abnormalities, disc spaces and neural foramina were normal, and the craniovertebral junction was unremarkable. (R. at 228). The conclusion was that Plaintiff's cervical spine was normal. (R. at 228). Similarly, an imaging study of Plaintiff's shoulder the same day also revealed no abnormality. (R. at 229). Follow-up MRI studies of Plaintiff's right shoulder and neck on July 25, 2007 revealed only slight abnormalities. (R. at 230 – 32).

On or about June 27, 2007, a treatment summary was completed by Plaintiff's physical therapist following six treatment sessions. (R. at 212). In the summary, the physical therapist indicated that Plaintiff's therapy consisted of gentle stretching, strengthening and conditioning exercises, application of moist heat, and electrical stimulation for reduction of pain in Plaintiff's neck and shoulders. (R. at 212, 225). In spite of these activities, Plaintiff complained of

significant headache pain as of that date. (R. at 212). Plaintiff never mentioned headache pain to her therapist at her initial evaluation prior to treatment, however, and made no significant complaints of headache pain during treatment – as reflected in treatment notes. (R. at 214 – 18, 220 – 25).

On June 28, 2007, Plaintiff was again examined by Dr. Liszewski. (R. at 284). Plaintiff claimed that she suffered primarily from neck pain radiating into her head, causing headaches. (R. at 284). The headache occurred daily and was generally dull. (R. at 284). She rated the pain as 5 on a pain scale of 10. (R. at 284). Plaintiff had a history of tension headaches for which she was prescribed Pamelor, but she had since ceased taking the medication for an unknown reason. (R. at 284).

On July 31, 2007, Dr. Liszewski examined Plaintiff for a follow-up regarding neck, shoulder, and right arm pain. (R. at 282). She complained that her neck pain radiated into her head and caused headaches. (R. at 282). Dr. Liszewski recorded that Plaintiff had failed to achieve relief through physical therapy. (R. at 282). He observed that her recent diagnostic imaging results showed mild abnormality in her neck and shoulder. (R. at 282). Despite Plaintiff's complaints, Dr. Liszewski believed that Plaintiff was capable of working. (R. at 282). He felt that her pain could be maintained with ibuprofen and prescription Flexiril and Pamelor. (R. at 282). According to Dr. Liszewski: "there are no signs that doing activity will cause any damage or harm to [Plaintiff]." (R. at 282).

In September 2007, Plaintiff was referred to a pain specialist for evaluation. (R. at 234 – 37). Plaintiff was examined by Evelyn Oteng-Bediako, M.D. (R. at 234 – 37). Dr. Bediako noted that Plaintiff complained of neck pain and associated headache pain beginning in July 2007. (R. at 234 – 37). Plaintiff described participating in physical therapy in an attempt to

4

diminish her pain, but found that with physical therapy her headaches only worsened. (R. at 234 – 37). Plaintiff was diagnosed with neck pain secondary to cervical facet disease, cervical myofacial pain syndrome, cervicogenic pain with headaches, and right shoulder pain secondary to hypertrophic degenerative changes of the right acromioclavicular joint. (R. at 234 – 37). Dr. Bediako recommended injections, muscle relaxants, and continued physical therapy. (R. at 234 – 37). Plaintiff was reluctant to receive injections or engage in physical therapy. (R. at 234 – 37). Plaintiff was to contact Dr. Bediako if she wished to try any of the suggested treatment modalities. (R. at 234 – 37).

Also in September 2007, Plaintiff was seen by orthopedic physician Stuart Anderson, M.D. for complaints of pain in her neck, right arm, and right hand. (R. at 246, 252 – 53). Plaintiff informed Dr. Stuart that she had been experiencing this pain for approximately three months. (R. at 246, 252 – 53). She alleged that this pain was associated with nausea, vomiting, and headaches. (R. at 246, 252 – 53). Plaintiff indicated that the pain in her neck and right shoulder was 8 on a pain scale of 10. (R. at 246, 252 – 53). Dr. Stuart noted Plaintiff's recent diagnostic imaging indicating the presence of mild abnormality. (R. at 246). Dr. Stuart believed that Plaintiff's neck was the genesis of many of her complaints. (R. at 247). She was scheduled for epidural injections. (R. at 247).

Plaintiff was seen again by Dr. Bediako in October 2007. (R. at 331). She informed Dr. Bediako that her pain was significantly improved with medication. (R. at 331). Plaintiff made no mentioned of headaches. (R. at 331). Dr. Bediako reminded Plaintiff of the potential benefits of injections to treat pain, but Plaintiff wished to continue using prescription medication, only. (R. at 332).

5

In November 2007, Plaintiff was examined by Dr. Liszewski. (R. at 280). He noted that Plaintiff had been diagnosed with carpal tunnel syndrome in her right wrist. (R. at 280). She also was continuing to see a pain specialist for her neck, and was taking prescription Neurontin and a muscle relaxer for treatment. (R. at 280). She had refused all recommendations that she try trigger point injections or epidural injections for her pain. (R. at 280). Dr. Liszewski made no mention of headaches. (R. at 280). Plaintiff also visited Dr. Bediako in November 2007. (R. at 329). She complained of increased headache when turning her head to the right. (R. at 329). She was continued on prescription medication, and again refused to consider injections for pain treatment. (R. at 330).

At a follow-up in December 2007, Plaintiff informed Dr. Bediako that her prescription medication was working well. (R. at 327). She rated her pain as 1 on a pain scale of 10. (R. at 327). Plaintiff was not receptive to suggestions that she supplement her treatment with injections. (R. at 327). Pain management treatment continued this way through March 10, 2009 with Dr. Bediako and specialist Mark Quintero, M.D. (R. at 311 – 26). Dr. Bediako generally noted that Plaintiff was doing well, and that her pain was controlled. (R. at 311 – 26). Plaintiff generally reiterated this characterization. (R. at 311 – 26). CT scans of Plaintiff's brain on June 16, 2008 showed no abnormality. (R. at 289). As of March 2009, however, Plaintiff was complaining of increased headache pain and lack of relief from her prescribed medications. (R. at 311). In early April 2009, she complained only of neck and shoulder pain. (R. at 337). She did not report pain greater than 3 on a pain scale of 10. (R. at 337). Her medication regimen provided significant relief. (R. at 337).

On April 16, 2009, Dr. Quintero assessed Plaintiff for complaints of knee, neck, and shoulder pain. (R. at 348). While Plaintiff reported a significant flare-up in pain experienced,

she made no mention of headaches. (R. at 348). Plaintiff also described helping her husband with various strenuous landscaping projects around their home. (R. at 348).

State agency evaluator Melany Froic completed a physical residual functional capacity assessment on May 13, 2009, following a review of Plaintiff's medical record. (R. at 61 – 67). Ms. Froic diagnosed Plaintiff with cervical myofacial pain syndrome, degenerative joint disease, and carpal tunnel syndrome. (R. at 61 – 67). She noted that during her review she found no limitations findings produced by any of Plaintiff's treating medical sources. (R. at 61 – 67). Ms. Froic noted Plaintiff's complaints of headache pain, but found that medical notes on record generally indicated that such pain was controlled with medication. (R. at 61 – 67). She also concluded that Plaintiff's activities of daily living were relatively uninhibited by Plaintiff's diagnosed conditions. (R. at 61 – 67). No limitation findings attributable to Plaintiff's alleged headaches were made by Ms. Froic. (R. at 61 – 67).

Dr. Quintero's pain management notes show that Plaintiff continued with treatment through August 6, 2009. (R. at 358 – 65). Plaintiff never mentioned headache pain between May and August 2009. (R. at 358 – 65). When she did allege experiencing pain, Plaintiff's chief complaints during this period involved only her joints. (R. at 358 – 65). Plaintiff indicated to neurologist Farooq Hassan, M.D. in June 2009 that she was not experiencing headache pain. (R. at 353 – 54).

No significant reference to headache pain is made by Plaintiff until October 15, 2009. (R. at 426). Plaintiff explained to Dr. Liszewski that she experienced two episodes of headache pain in the two weeks prior to visiting him. (R. at 426). Plaintiff mentioned having headache pain again on December 18, 2009. (R. at 391). She did not describe the frequency or severity, however. (R. at 391). Conversely, she informed Dr. Hassan on June 15, 2009 that she was not

7

experiencing headaches. (R. at 400 – 01). Plaintiff reiterated this statement in September of 2009, and March and December of 2010 to Dr. Hassan. (R. at 393 – 95, 398 – 99). An MRI of Plaintiff's brain on October 20, 2009 had revealed no significant abnormality. (R. at 432).

### 3. Administrative Hearing

At her hearing before the ALJ, Plaintiff testified that she experienced dull, gnawing headache pain for up to two weeks at a time, approximately once per month. (R. at 39). She attributed her headaches to neck and shoulder pain which Plaintiff suffered simultaneously. (R. at 39). Plaintiff alleged that her headaches worsened with activity – as was the case when she attempted to engage in physical therapy. (R. at 40).

Plaintiff claimed that her headaches occasionally affected her ability to function, and that the pain made her "uncomfortable all the time." (R. at 47). The severity of the headaches was widely variable. (R. at 47, 52 – 53). The headaches purportedly made concentration difficult, and Plaintiff felt that it would make holding a normal full-time job difficult. (R. at 53). Plaintiff indicated that she regularly visited pain management specialists and neurologist for her conditions. (R. at 40 – 41). Plaintiff explained that she took a number of medications for her pain. (R. at 39). Plaintiff testified that she had only agreed to one injection for pain, and declined to follow further suggestions to continue with the injections. (R. at 40).

Following Plaintiff's testimony, the ALJ and Plaintiff's counsel questioned a vocational expert regarding what jobs might be available to a hypothetical person with Plaintiff's limitations. Plaintiff's counsel presented to the vocational expert a hypothetical wherein an individual would be off-task at work between fifteen and twenty percent of any given work day due to the effects of pain on the individual's ability to concentrate. (R. at 57). According to the

vocational expert, a person so limited would be unable to maintain full-time employment. (R. at 57).

**B.  ANALYSIS**

**1. Standard of Review**

To be eligible for social security benefits under the Act, a claimant must demonstrate to the Commissioner that he or she cannot engage in substantial gainful activity because of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least twelve months. 42 U.S.C. §423(d)(1)(A); *Brewster v. Heckler,* 786 F.2d 581, 583 (3d Cir. 1986). When reviewing a claim, the Commissioner must utilize a five-step sequential analysis to evaluate whether a claimant has met the requirements for disability. 20 C.F.R. §§ 404.1520, 416.920.

The Commissioner must determine: (1) whether the claimant is currently engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or a combination of impairments that is severe; (3) whether the medical evidence of the claimant's impairment or combination of impairments meets or equals the criteria listed in 20 C.F.R., Pt. 404, Subpt. P, App'x 1; (4) whether the claimant's impairments prevent him from performing his past relevant work; and (5) if the claimant is incapable of performing his past relevant work, whether he can perform any other work which exists in the national economy. 20 C.F.R. §404.1520(a)(4); *see Barnhart v. Thomas*, 540 U.S. 20, 24-25 (2003). If the claimant is determined to be unable to resume previous employment, the burden shifts to the Commissioner (Step 5) to prove that, given claimant's mental or physical limitations, age, education, and work

experience, he or she is able to perform substantial gainful activity in jobs available in the national economy. *Doak v. Heckler*, 790 F.2d 26, 28 (3d Cir. 1986).

Judicial review of the Commissioner's final decisions on disability claims is provided by statute. 42 U.S.C. §§ 405(g)[2] and 1383(c)(3)[3]. Section 405(g) permits a district court to review the transcripts and records upon which a determination of the Commissioner is based; the court will review the record as a whole. *See* 5 U.S.C. §706. The district court must then determine whether substantial evidence existed in the record to support the Commissioner's findings of fact. *Burns v. Barnhart,* 312 F.3d 113, 118 (3d Cir. 2002).

Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate" to support a conclusion. *Ventura v. Shalala*, 55 F.3d 900, 901 (3d Cir. 1995) (quoting *Richardson v. Perales,* 402 U.S. 389, 401 (1971)). If the Commissioner's findings of fact are supported by substantial evidence, they are conclusive. 42 U.S.C. § 405(g); *Richardson,* 402 U.S. at 390. When considering a case, a district court cannot conduct a *de novo* review of the Commissioner's decision nor re-weigh the evidence of record; the court can only judge the propriety of the decision in reference to the grounds invoked by the Commissioner when the decision was rendered. *Palmer v. Apfel*, 995 F.

---

[2] Section 405(g) provides in pertinent part:

> Any individual, after any final decision of the [Commissioner] made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action ... brought in the district court of the United States for the judicial district in which the plaintiff resides, or has his principal place of business

42 U.S.C. § 405(g).

[3] Section 1383(c)(3) provides in pertinent part:
> The final determination of the Commissioner of Social Security after a hearing under paragraph (1) shall be subject to judicial review as provided in section 405(g) of this title to the same extent as the Commissioner's final determinations under section 405 of this title.

42 U.S.C. § 1383(c)(3).

Supp. 549, 552 (E.D. Pa. 1998); *S.E.C. v. Chenery Corp.*, 332 U.S. 194, 196 – 97 (1947). The court will not affirm a determination by substituting what it considers to be a proper basis. *Chenery*, 332 U.S. at 196 – 97. Further, "even where this court acting *de novo* might have reached a different conclusion . . . so long as the agency's factfinding is supported by substantial evidence, reviewing courts lack power to reverse either those findings or the reasonable regulatory interpretations that an agency manifests in the course of making such findings." *Monsour Medical Center v. Heckler*, 806 F. 2d 1185, 1190-91 (3d. Cir. 1986).

**2. Discussion**

With respect to Plaintiff's claim regarding the inclusion of her headaches as a "severe impairment," the court notes that such impairment is defined by regulation as "any impairment . . . which significantly limits your physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1520(c), 416.920(c). In practice, the ALJ's analysis at Step 2 to determine whether or not an alleged impairment is "severe," is no more than a "*de minimis* screening device to dispose of groundless claims." *Magwood v. Comm'r of Soc. Sec.*, 417 Fed. App'x 130, 132 (3d Cir. 2008) (quoting *Newell v. Comm'r of Soc. Sec.*, 347 F. 3d 541, 546 (3d Cir. 2003)). Impairment is not "severe" where the record demonstrates only "slight abnormality or a combination of slight abnormalities which have 'no more than a minimal effect on an individual's ability to work.'" *Id.*

Given, then, that the purpose of Step 2 is merely to serve a minimal gate-keeping function, Plaintiff's burden is not an exacting one. *McCrea v. Comm'r of Soc. Sec.*, 370 F. 3d 357, 360 (3d Cir. 2004) (citing S.S.R. 85-28, 1985 WL 56856 at *3). Reasonable doubts regarding the evidence should be construed in the light most favorable to the claimant. *Newell*,

347 F. 3d at 547. Further, the use of Step 2 as a vehicle for the denial of benefits should, "raise a judicial eyebrow," and deserves "close scrutiny." *McCrea*, 370 F. 3d at 360 – 61.

However, the present case is factually distinguishable from both *Newell* and *McCrea*. Here, the ALJ did not base his denial squarely upon his Step 2 analysis. He continued on with his discussion of the record, denying Plaintiff DIB at Step 5. This case does not, therefore, warrant the same level of scrutiny. Regardless, the court must look to whether the ALJ provided substantial evidence as justification for his decision – whether he stopped at Step 2 or continued through Step 5. *Kirk v. Comm'r of Soc. Sec.*, 177 Fed. App'x 205, 207 (3d Cir. 2006); *McCartney v. Comm'r of Soc. Sec.*, 2009 WL 1323578 at *13 – 16 (W.D. Pa. May 8, 2009).

In his June 4, 2010 decision, the ALJ provided substantial evidence to justify not classifying Plaintiff's headaches as "severe impairments." His initial statement was that he was not inclined to consider Plaintiff's headaches to be "severe" because she had no emergency room visits or hospitalizations for her headaches. (R. at 20). Further, while Plaintiff engaged in pain management, she did not seek the care of headaches specialists, and the record as a whole indicated that her headaches were well-controlled with prescription medication. (R. at 20). These statements were an accurate characterization of the record.

Moreover, when the ALJ was discussing the facts relevant to the formulation of his residual functional capacity assessment, he reviewed Plaintiff's complaints regarding her headaches, and the various treating medical sources' notes about same. (R. at 22 – 24). Specifically, the ALJ noted that while Plaintiff claimed to suffer headaches which interfered with her functioning, the objective medical record – including doctors' notes and diagnostic imaging results – did not reflect the severity of these complaints. (R. at 22 – 24). In fact, the medical record frequently included notations – some involving Plaintiff's own statements to treating

sources – that Plaintiff's pain was controlled with medication. (R. at 22 – 24). As a result, Plaintiff's testimony regarding her subjective complaints lacked credibility. (R. at 22 – 24). There was nothing therein which suggested that Plaintiff's headaches affected her concentration, or would create more than a minimal effect on Plaintiff's ability to work. (R. at 22 – 24). In light of this court's review of the factual record and the ALJ's decision analysis, it is clear that the ALJ's determination not to include Plaintiff's headaches as a "severe impairment" at Step 2 was supported by substantial evidence.

C. **CONCLUSION**

Based upon the foregoing, the ALJ provided a thorough evidentiary basis to allow this court to conclude that substantial evidence supported his decision. Accordingly, it is respectfully recommended that Plaintiff's Motion for Summary Judgment be denied, Defendant's Motion for Summary Judgment be granted, and the decision of the ALJ be affirmed.

In accordance with the Magistrate Judges Act, 28 U.S.C. § 636(b)(1)(B) and (C), and Rule 72.D.2 of the Local Rules of Court, the parties are allowed fourteen (14) days from the date of service of a copy of this Report and Recommendation to file objections. Any party opposing the objections shall have fourteen (14) days from the date of service of objections to respond thereto. Failure to file timely objections will constitute a waiver of any appellate rights.

_____
Lisa Pupo Lenihan
United States Magistrate Judge

Dated: April 30, 2012